Steve W. Berman (*pro hac vice* pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel.: 206.623.7292
Fax: 206.623.0594
Email: steve@hbsslaw.com

Christopher R. Pitoun (SBN 290235)
301 N. Lake Ave., Suite 920
Pasadena, CA 91101
Tel.: 213-330-7150
Fax: 213-330-7512
Email: christopherp@hbsslaw.com

*Attorneys for Plaintiffs*
[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE A.T., JANE DOE D.D., MEGGIE KWAIT, JANE DOE M.M., JANE DOE H.R., JANE DOE 1, JANE DOE J.L., JANE DOE F.M., JANE DOE 2, JANE DOE J.C., JANE DOE A.N., JANE DOE N.K., JANE DOE L.Y., JANE DOE T.Y., JANE DOE A.H., individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UNIVERSITY OF SOUTHERN CALIFORNIA, BOARD OF TRUSTEES OF THE UNIVERSITY OF SOUTHERN CALIFORNIA, and GEORGE TYNDALL, M.D., <br> Defendants. | No.  2:18-cv-4940 <br><br> <u>CLASS ACTION</u> <br><br> CLASS ACTION COMPLAINT <br><br><br> **JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

003211-11 1036534 V1

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................... 1

II.    JURISDICTION AND VENUE ............................................................ 2

III.   THE PARTIES ...................................................................................... 2

IV.    FACTS .................................................................................................... 4

    A.     Students (and their parents) entrusted their medical care to USC. .............................................................................................. 4

    B.     Tyndall's and USC's abuse of trust. ........................................... 6

    C.     Patients complained about Tyndall's behavior to USC, and refused to be scheduled with him again. ................................... 10

    D.     USC admits it was on notice of Tyndall's violation of female students. ...................................................................................... 12

    E.     Plaintiffs were violated by Dr. Tyndall, with the knowledge of USC. .............................................................................................. 14

        1.     Jane Doe A.T. (1991-1992) .............................................. 14

        2.     Jane Doe D.D. (2005-2006) .............................................. 15

        3.     Meggie Kwait (2008) ........................................................ 18

        4.     Jane Doe M.M. (2008) ....................................................... 19

        5.     Jane Doe H.R. (2010) ........................................................ 20

        6.     Jane Doe 1 (2010-2011) .................................................... 22

        7.     Jane Doe J.L. (2011-2013) ................................................ 24

        8.     Jane Doe F.M. (2012-2013) .............................................. 25

        9.     Jane Doe 2 (2013-2014) .................................................... 27

        10.    Jane Doe J.C. (2011 – 2015) ............................................ 29

        11.    Jane Doe A.N. (2015) ....................................................... 30

        12.    Jane Doe N.K. (2013-2017) .............................................. 32

        13.    Jane Doe L.Y. (2016) ........................................................ 32

        14.    Jane Doe T.Y. (2016) ........................................................ 34

        15.    Jane Doe A.H. (2016) ....................................................... 35

F.     The statute of limitations is tolled based on the continuing violations doctrine and fraudulent concealment. ................................... 37

V.     CLASS ALLEGATIONS ................................................................ 40

VI.    CAUSES OF ACTION ................................................................... 42

COUNT I  VIOLATONS OF TITLE IX, 20 U.S.C. § 1681(A), *ET SEQ*. (AGAINST USC AND USC TRUSTEES) ......................................... 42

COUNT II   VIOLATION OF THE CALIFORNIA EQUITY IN HIGHER EDUCATION ACT [CAL. ED. CODE § 66270] (AGAINST THE USC, USC TRUSTEES, AND TYNDALL) ...................................... 42

COUNT III  GENDER VIOLENCE [CAL. CIV. CODE § 52.4] (AGAINST TYNDALL AND USC) ................................................ 43

COUNT IV  GROSS NEGLIGENCE (AGAINST THE USC, USC TRUSTEES, AND TYNDALL) ........................................................ 44

COUNT V  NEGLIGENT SUPERVISION AND RETENTION (AGAINST USC AND USC TRUSTEES) ......................................... 45

COUNT VI  CIVIL BATTERY (AGAINST TYNDALL AND USC) .................... 46

COUNT VII  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (AGAINST TYNDALL AND USC) .............................. 47

COUNT VIII  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (AGAINST TYNDALL AND USC) ................................................ 48

COUNT IX  RATIFICATION (AGAINST USC AND USC TRUSTEES) ............. 50

PRAYER FOR RELIEF ............................................................................ 50

- ii -

Plaintiffs, individually and on behalf of all women who received a medical examination from Dr. George Tyndall at the University of Southern California, alleges as follows:

## I.    INTRODUCTION

1.    Trust is an essential part of the relationship between physician and patient. "Without trust, how could a physician expect patients to reveal the full extent of their medically relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[1]

2.    George Tyndall, M.D. violated this trust by taking advantage of female students who sought examination by a gynecologist at the University of Southern California's ("USC") student-health center. Tyndall used his position of trust to place women in a place of complete vulnerability: naked or partially unclothed in a closed examination room with the expectation that physical contact would occur for medical treatment in accordance with the standard of care.

3.    Tyndall violated this trust by causing physical contact, including in the form of sexual abuse, molestation, and unwanted touching, in violation of his female patients that was not for the purpose of providing medical care, but for the purpose of providing Tyndall with sexual gratification.

4.    USC violated its female students' trust by knowingly putting women in the room for treatment by Tyndall, knowing that inappropriate physical contact and violations would occur. In fact, USC nurses, chaperones, and other staff members were regularly present in the examination rooms, observed the inappropriate sexual molestation, and took no steps to stop it as it occurred.

---

[1] Susan Dorr Goold, MD, MHSA, MA, "Trust, Distrust and Trustworthiness, Lessons from the Field," J Gen Intern Med. 2002 Jan; 17(1): 79–81, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495000/ (last accessed May 19, 2018) (citations omitted).

- 1 -

5.      Moreover, even as numerous supervisors and administrators became aware of Tyndall's harmful conduct, USC failed to act to protect its female students by removing Tyndall from his position even though it was clear he was unfit to treat patients.

6.      Defendants' sexual abuse, molestation, unwanted sexual touching and contact has caused widespread damage to Plaintiffs and the Class, for which Defendants must be held responsible.

## II.      JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States. This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are dozens, and likely hundreds, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and Defendants are citizens of a State different from that of Plaintiffs and members of the Class.

8.      Venue is proper in this District under 28 U.S.C. § 1391 (a)-(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

## III.     THE PARTIES

9.      Jane Doe A.T. is a resident of New York City and Basel, Switzerland and a citizen of the United States.

10.     Jane Doe D.D. is a resident of Sherman Oaks, California and a citizen of the United States.

- 2 -

003211-11 1036534 V1

11.     Meggie Kwait is a resident of New York, New York and a citizen of the United States.

12.     Jane Doe M.M. is a resident of Nashville, Tennnessee and a citizen of the United States.

13.     Jane Doe H.R. is a resident of Los Angeles, California and a citizen of the United States.

14.     Jane Doe 1 is a resident of Los Angeles, California and a citizen of the United States.

15.     Jane Doe J.L. is a resident of Sherman Oaks, California and a citizen of the United States.

16.     Jane Doe F.M. is a resident of Los Anegles, California and a citizen of the United States.

17.     Jane Doe 2 is a resident of Studio City, California and a citizen of the United States.

18.     Jane Doe J.C. is a resident of Chicago, Illinois and a citizen of the United States.

19.     Jane Doe A.N. is a resident of Los Angeles, California and a citizen of the United States.

20.     Jane Doe N.K. is a resident of Los Angeles, California and a citizen of the United States.

21.     Jane Doe L.Y. is a resident of St. Louis, Missouri and a citizen of the United States.

22.     Jane Doe T.Y. is a resident of Los Angeles, California and a citizen of the United States.

23.     Jane Doe A.H. is a resident of West Hollywood, California and a citizen of the United States.

24.     Defendant USC's principal place of business is in Los Angeles County, California.

25.     As a private corporation, USC is governed by the Board of Trustees of The University of Southern California, which has approximately 55 voting members. The board is a self-perpetuating body, electing one-fifth of its members each year for a five-year term of office. Hereinafter, USC and the Board of Trustees will be referred to collectively as the USC Defendants.

26.     Defendant George Tyndall, M.D. is an adult male who is a resident of Los Angeles County and citizen of the United States. Tyndall started working as a gynecologist at USC's student-health center in or about 1989, and reportedly examined as many as 16 women per day at the clinic.

## IV.     FACTS

### A.     Students (and their parents) entrusted their medical care to USC.

27.     Experts have asserted that health is an important factor for academic achievement in higher education.[2] "Health complaints limit students' capacity to perform adequately at university."[3] Thus, a university's promotion of health and well-being of its students promotes effective learning.[4]

28.     To that end, USC touts the services of its student-health center to its students.  It regularly runs workshops designed to invite the trust of students, such as a

_____

[2] Ansari, "Is the Health and Wellbeing of University Students Associated with their Academic Performance?" Int J Environ Res Public Health. 2010 Feb; 7(2): 509–527, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2872284/#b3-ijerph-07-00509 (last accessed May 19, 2018) (citations omitted).

[3] Ansari, "Is the Health and Wellbeing of University Students Associated with their Academic Performance?" Int J Environ Res Public Health. 2010 Feb; 7(2): 509–527, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2872284/#b3-ijerph-07-00509 (last accessed May 19, 2018) (citations omitted).

[4] Ansari, "Is the Health and Wellbeing of University Students Associated with their Academic Performance?" Int J Environ Res Public Health. 2010 Feb; 7(2): 509–527, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2872284/#b3-ijerph-07-00509 (last accessed May 19, 2018) (citations omitted).

- 4 -

series of "Feel Better Workshops" entitled "Relationships and Connection," "Addressing Academic Anxiety," "Stress Management," and "Calm Your Anxiety."[5]

29.     Women are encouraged to start seeing a gynecologist once a year when they turn 18 years old.[6] Thus, many of the women who are examined at USC's student-health center have never had a gynecological examination before.[7]

30.     USC provides its female students "a full range of women's health care services including well women annual visits, testing, contraceptives and pregnancy counseling."[8] USC explains: "These are yearly comprehensive, individual assessments of your health. These visits include a physical exam, a pelvic exam and screening for any other health problems. Use this visit as an opportunity to discuss any questions or concerns you have about your health with your doctor."

31.     USC's invitation to its female students to discuss concerns about their health presumes a relationship of trust.

32.     Trust is essential to both physician and patient.[9] "Without trust, how could a physician expect patients to reveal the full extent of their medically relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[10]

---

[5] https://engemannshc.usc.edu/events/ (last accessed May 19, 2018).

[6] http://www.4collegewomen.org/fact-sheets/firstgyno.html (last accessed May 21, 2018).

[7] https://www.latimes.com/local/california/la-me-usc-doctor-misconduct-complaints-20180515-story.html (last accessed May 21, 2018).

[8] http://sc.edu/about/offices_and_divisions/student_health_services/medical-services/womens-health/index.php (last accessed May 19, 2018).

[9] Susan Dorr Goold, MD, MHSA, MA, "Trust, Distrust and Trustworthiness, Lessons from the Field," J Gen Intern Med. 2002 Jan; 17(1): 79–81, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495000/ (last accessed May 19, 2018).

[10] *Id.*

33.     "Presumed consent is a critical manifestation of trust that makes possible much of routine doctor visits."[11] Absent a presumption of trust, patients might avoid essential medical care.[12]

34.     "Important as it is to measure trust in individual clinicians and the actions and circumstances that affect it, it is equally important, in today's health system, to study (empirically and normatively) trust and trustworthiness in organizations and institutions."[13]

35.     Knowing and inviting female students to place trust in its physicians, USC had a duty to ensure that Tyndall used his trusted position and the safe confines of a doctor's exam room at the USC student-health center consistent with the standard of care and certainly not to abuse that trust through the molestation of students.

**B.     Tyndall's and USC's abuse of trust.**

36.     For nearly 30 years, the University of Southern California's student-health clinic's only full-time gynecologist was Tyndall. USC hired Tyndall in 1989 after his residency.

37.     According to the first report to expose Tyndall and USC, Tyndall used his position of trust to forego the standard of care. For example, in the exam room, Tyndall was typically accompanied by a female nurse or medical assistant known as a chaperone—a practice embraced by many male gynecologists.[14]

38.     In the years after Tyndall started, some chaperones reportedly became alarmed about the frequency with which he used a camera during pelvic exams.[15]

---

[11] *Id.*, citing Faden R, Beauchamp T. A History and Theory of Informed Consent. New York: Oxford University Press; 1986. pp. 274–80.

[12] *Id.*

[13] *Id.*

[14] https://www.latimes.com/local/california/la-me-usc-doctor-misconduct-complaints-20180515-story.html (last accessed May 21, 2018).

[15] *Id.*

Tyndall's chaperones questioned his motivations, with one reporting he took multiple pictures of hundreds of patients' genitals, while another said she witnessed 50 to 100 patients photographed.[16]

39.     According to the Los Angeles Times, Bernadette Kosterlitzky, a clinic nurse from 1992 to 2013, said that after a chaperone alerted administrators to the camera, then-Executive Director Dr. Lawrence Neinstein ordered it removed.[17]

40.     In fact, a member of the USC student-health center's oversight committee purportedly admitted that: (i) in the early 2000s, several students submitted letters concerning inappropriate touching and remarks by Tyndall; and (ii) those complaint letters were read aloud during monthly committee meetings.[18]  One member of the committee confronted Tyndall, and that confrontation is allegedly contained in university records that corroborate his accounts.[19]

41.     After USC's grand opening of its new Engemann Student Health Center in or about 2013, chaperones became concerned regarding Tyndall's treatment of female patients.

42.     Chaperones were concerned about "full body scans," where "Tyndall frequently had women lie naked on the exam table while he slowly inspected every part of their body, down to the area between their buttocks."[20]  While a woman's annual gynecological visit might include a discussion of skin problems, such "meticulous" inspections of a patient's naked body "would be highly unusual if not inappropriate."[21]

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

43.     While Tyndall conducted examinations, he made comments that the nursing staff found "unseemly," describing patients' skin as "flawless," "creamy" or "beautiful." He told students they had "perky breasts."[22]

44.     In the spring of 2013, eight chaperones reported concerns about Tyndall to their supervisor, veteran nurse Cindy Gilbert. Gilbert went to Neinstein, the clinic's executive director, and the then-head of clinic nursing and now the clinic's executive director, Tammie Akiyoshi. Gilbert said Neinstein told her that he had talked to Tyndall about his behavior in the past.[23]

45.     Neinstein reportedly referred the complaints to the university's Office of Equity and Diversity, which investigates sexual misconduct and racial and gender discrimination. USC has stated that an investigator interviewed seven employees and a patient, according to USC. However, Gilbert and multiple chaperones who complained said they were never informed of the probe or questioned by the investigator.[24]

46.     The investigation apparently concluded there was no violation of school policy. The only action that Neinstein took was to bar Tyndall from locking the door of his office when patients were present.[25]

47.     Tyndall then increased his attempts to groom patients, particularly of Chinese ethnicity.[26]

48.     In his office, Tyndall had a map of China and encouraged women to point out their home province. He kept a bamboo plant, the traditional Chinese symbol of longevity and vitality, on a shelf above his desk. He sometimes showed off a photo of his Filipina wife and shared details of their relationship.[27]

---

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

49.    In addition to grooming, Tyndall took steps to require patients to return for appointments more often. For example, while most physicians will prescribe one year's worth of birth control pill refills, Tyndall would only prescribe two months. He would not extend the prescription until the patients returned for another examination.[28]

50.    However, as Tyndall's grooming efforts increased, so did the chaperones' concerns.

51.    Chaperones began discussing the way Tyndall used his fingers at the outset of the pelvic exam for many young women. Before inserting a speculum, the metal duck-billed device that spreads open the walls of the vagina and enables the doctor to view the cervix, Tyndall would voice concern that the speculum might not fit.[29]

52.    The Los Angeles Times reported:

> "He would put one finger in and say, 'Oh, I think it will fit. Let's put two fingers in,'" said a chaperone who worked with Tyndall for years. Four people familiar with Tyndall's exams said that while he spoke, he was moving his fingers in and out of the patients.

> They said he made nearly identical statements to hundreds of women as he probed them: My, what a tight muscle you have. You must be a runner.

> The chaperone who worked with Tyndall for years said she witnessed at least 70 such exams and remembered thinking the physician would eventually become embarrassed about repeating the same words to student after student.

> "He never was," she said.

> During some exams, Tyndall made explicit reference to sexual intercourse while his fingers were inside patients, according to five people who heard the remarks or were told about them.

---

[28] *Id.*

[29] *Id.*

"He would tell young ladies their hymens are intact. 'Don't worry about it, your boyfriend's gonna love it,'" a chaperone recalled.[30]

53.     The chief of Female Pelvic Medicine and Reconstructive Surgery at University Hospitals Cleveland Medical Center, Dr. Sangeeta Mahajan, has stated that she has never heard of a gynecologist moving his fingers in and out of a vagina to determine whether a speculum fit, calling it "very odd" and "creepy."[31]  An assistant professor of gynecology at Harvard Medical School, Dr. Louise King, said the practice was not standard.[32]

**C.     Patients complained about Tyndall's behavior to USC and refused to be scheduled with him again.**

54.     One nurse said that in 2013-14, she spoke to at least five women who refused to be scheduled with Tyndall despite having gynecological problems that needed immediate attention.  The patients reported feeling like "he was inappropriately touching them, that it didn't feel like a normal exam," and "like they were violated." The nurse told her immediate supervisor and later Akiyoshi, the head of nursing, who said they would look into it.[33]

55.     During the 2013-2016 period, one clinician received unsolicited complaints from at least three students who said they would never see Tyndall again. The clinician gave the students the email addresses for administrators and encouraged them to put their complaints in writing.[34]

56.     Having already felt uncomfortable on how Tyndall violated her with his hand during a gynecological exam before the speculum was inserted, one student was told on her second visit that Tyndall wanted her to remove all her clothes. After

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

- 10 -

waiting for Tyndall naked, she got dressed, after asking herself why she needed to take off all her clothes. She told a female clinic employee she wanted to see another doctor. That employee reportedly told the student "there were a lot of complaints" about Tyndall.[35]

57.     Chaperones reported the names of women "who seemed particularly shaken" by Tyndall's exams to their supervisor, nurse Gilbert. Gilbert allegedly contacted patients and explained how to make a written complaint against the doctor. Some did, but others responded they just wanted to find another gynecologist and forget about the experience.[36]

58.     Gilbert stated she repeatedly expressed concerns about Tyndall to Akiyoshi, Neinstein, and other clinic administrators from 2014 to 2016, but they seemed uninterested.[37]

59.     Chaperones forwarded some complaints about Tyndall to Sandra Villafan, who became the clinic's head of quality and safety in 2013. Villafan has stated she relayed any concerns to clinic administrators and university leadership, but was not privy to the outcomes of any investigations.[38]

60.     Finally, in 2016, Gilbert went to USC's rape crisis center, known as Relationship and Sexual Violence Prevention and Services, and spoke to Executive Director Ekta Kumar. That complaint (and the discovery of a box of film of women's genitalia in Tyndall's office) finally prompted the investigation that led to Tyndall's removal.[39]

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

**D.     USC admits it was on notice of Tyndall's violation of female students.**

61.     On May 15, 2018, USC issued a release titled "Summary of Coordinated Investigation of Student Health Physician" ("Statement") from Todd R. Dickey, Senior Vice President for Administration, Gretchen Dahlinger Means, Title IX Coordinator and Executive Director of the Office of Equity and Diversity, and Laura LaCorte, Associate Senior Vice President for Compliance.[40]

62.     The Statement admitted that, in June 2016, USC's Office of Equity and Diversity ("OED") received a complaint from a staff member at the student-health center regarding sexually inappropriate comments made to patients in front of medical assistants by Tyndall.[41]

63.     As a result, USC states that it conducted an investigation. USC reported that medical assistants who assisted Dr. Tyndall during clinic visits reported concerns about the way he conducted pelvic examinations. Specifically, these medical assistants questioned Tyndall's practice of a digital insertion prior to insertion of a speculum.[42]

64.     USC purportedly consulted with a gynecology expert who stated that this could be considered an acceptable practice, but then contracted with an outside medical review firm, MD Review, to review Dr. Tyndall's clinical practice. MD Review concluded that this examination practice was not the standard of care.[43]

65.     USC stated that, during its investigation, a box of clinical photos of cervixes and surrounding internal tissue allegedly from 1990-1991 was found during a search of Tyndall's office.[44]

--------

[40] *See* http://pressroom.usc.edu/statement-of-facts-may-15-2018/ (last accessed May 19, 2018).

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] *See id.*

66.     USC reported that it also reviewed the files of Dr. Larry Neinstein, the former health center director from 1995-2014 (who is now deceased), which showed earlier patient complaints about Tyndall, including complaints about his clinical practice. The files contained eight complaints logged between 2000 and 2014 that were concerning. These included racially insensitive and other inappropriate comments, concerns that he was not adequately sensitive to patient privacy, a complaint of feeling "uncomfortable," another that Tyndall "gave me the skeevies," and another that he was "unprofessional."[45]

67.     USC admitted that these complaints were sufficient to terminate Tyndall, and should have been elevated for "proper investigation."

68.     Dr. Neinstein's notes also purportedly indicated that he brought in outside experts to review his clinical practices, although the Statement does not identify those experts nor the results of those engagements.[46]

69.     USC stated that OED had previously conducted a review in 2013 of complaints of inappropriate comments made by Tyndall raised by staff members, but that there was insufficient evidence to find a violation of university policy.[47]

70.     USC was silent on its failure to report Tyndall to criminal authorities, the attorney general or anyone outside the university for the purposes of conducting an independent investigation.[48]

71.     USC concluded its 2016 investigation, finding that "Tyndall had violated the university's policy on harassment by making repeated racially discriminatory and

---

[45] *See id.*

[46] *See id.*

[47] *See id.*

[48] *See id.*

sexually inappropriate remarks during patient encounters." The Statement was silent as to any conclusions concerning sexual assault, violation or molestation.[49]

72.    Ultimately, in 2017, the university began termination proceedings. However, USC did not contact law enforcement, the attorney general or the medical licensing board.[50] Nor did USC inform Tyndall's patients.[51] Because Tyndall threatened a lawsuit against USC, USC entered into a separation agreement with Tyndall.[52]

73.    USC states that, once Tyndall sent a letter to USC asking to return to his position at the student-health center in 2018, USC finally made a report to the California Medical Board on March 9, 2018. According to USC, this was the first report to authorities it had made despite being on notice of Tyndall's behavior for decades.[53]

**E.    Plaintiffs were violated by Dr. Tyndall, with the knowledge of USC.**

**1.    Jane Doe A.T. (1991-1992)**

74.    Jane Doe A.T. was an undergraduate accounting student at USC from 1991-1995. She saw Dr. Tyndall for a pap smear and pelvic exam in or about 1991 or 1992.

75.    Dr. Tyndall examined Jane Doe A.T. without a chaperone in the room. Because of her age and relative inexperience, Jane Doe A.T. did not know to ask for one. As they began the appointment, Jane Doe A.T. felt very alone – it did not seem like there were many people around or within earshot.

---

[49] *See id.*

[50] *See id.*

[51] https://www.latimes.com/local/california/la-me-usc-doctor-misconduct-complaints-20180515-story.html.

[52] *See* http://pressroom.usc.edu/statement-of-facts-may-15-2018/ (last accessed May 19, 2018).

[53] *See id.*

76.     Dr. Tyndall told Jane Doe A.T. to get undressed and put on an examination gown. He did not leave the room while she undressed.

77.     As Jane Doe A.T. lay on the examination table, naked but for the gown, with her legs spread, Dr. Tyndall commented that she was very beautiful and her vagina was attractive.

78.     Dr. Tyndall examined Jane Doe A.T. with his fingers. As he was touching her, he asked her if she would like him to show her her g-spot. She immediately said "no." She felt frightened, trapped, and violated. There was no one else in the examination room with Dr. Tyndall, and she felt as though Dr. Tyndall was trying to communicate that he had power over her body; that he was in control and he knew something she did not. Jane Doe A.T. desperately wanted to leave.

79.     Jane Doe A.T. is Vietnamese and Chinese-American. She was raised to never question her elders or authority figures, especially physicians. She also feels that her culture associates great shame with sexual abuse and molestation such that speaking up as a victim could bring shame on ones family.

80.     Jane Doe A.T. feels that her cultural background made her an easy target for Dr. Tyndall, and she is outraged and distressed that he abused many Asian women in the decades following her appointment.

81.     The experience with Dr. Tyndall had lasting effects on Jane Doe A.T. Although all doctors since then have treated her with respect and professionalism, she continues to have an aversion to seeing the gynecologist. In addition, Dr. Tyndall made Jane Doe A.T. feel belittled and sexualized. As a result, she had a negative relationship with her own body and sexuality for many years.

**2.     Jane Doe D.D. (2005-2006)**

82.     Jane Doe D.D. was a student at USC from 2004 to 2009.

83.     In or about 2005, Jane Doe D.D. made an appointment for a pap smear and pelvic exam at the USC student health center. It was Jane Doe D.D.'s first ever visit to the OBGYN.

84.     First, Dr. Tyndall performed an external exam on Jane Doe D.D. while there was no chaperone in the room.

85.     While Dr. Tyndall was examining Jane Doe D.D.'s breasts, Jane Doe D.D. noticed that he was not doing it in a way that seemed clinical, as opposed to what other doctors had done in the years after this first gynecological visit. Specifically, he did not examine her breasts quickly in a padding motion with his closed fingertips. Instead, Jane Doe D.D. felt as as though Dr. Tyndall was feeling her breasts for a long period.

86.     After Dr. Tyndall had his hands on Jane Doe D.D.'s naked breasts, he commented "mmm, very perky." Jane Doe D.D. became very nervous, but she tried to remain calm and brush off the comment.

87.     Then, Dr. Tyndall checked Jane Doe D.D.'s skin, which required her to lay down in front of him with her shirt off. He looked her up and down and commented that she was in great shape.

88.     While he was examining her, Dr. Tyndall mentioned his wife and pointed to his desk, mentioning that he had a photo of her there. At that moment, Jane Doe D.D. felt relieved because up until that point it had seemed to her as though Dr. Tyndall was sexualizing her.

89.     Before Dr. Tyndall performed the pap smear and pelvic exam, a chaperone came into the room.

90.     Dr. Tyndall put gloves on and informed Jane Doe D.D. that he was going to insert two fingers into her vagina to help the speculum fit in. He then inserted two fingers into Jane Doe D.D.'s vagina and said that he was going to check the strength of Jane Doe D.D.'s pelvic floor.

- 16 -

91.     Dr. Tyndall then moved his fingers back and forth three times fast while they were inside of Jane Doe D.D. He said to Jane Doe D.D., "you have a very strong muscle there. You must be a runner." Jane Doe D.D. laughed nervously, "no I'm a swimmer." Jane Doe D.D. again felt nervous, but she tried to reassure herself that maybe Dr. Tyndall was simply stating a fact. She told herself that his actions were normal, even though it did not feel normal.

92.     Toward the end of the exam, Dr. Tyndall asked Jane Doe D.D. if she would mind if he used a camera. He held up the small camera to show her, and he said that using it would help them to see any sexually transmitted diseases or any irregular tissue. Dr. Tyndall presented the camera in a way that made it seem as though it was not required. Instead, he encouraged Jane Doe D.D. to allow him to use the camera in a friendly, nonchalant tone. At the time, Jane Doe D.D. was sexually active and had a legitimate fear of contracting sexually transmitted diseases. She agreed because she wanted to do anything she could to increase her chances of detection.

93.     Dr. Tyndall never showed Jane Doe D.D. the camera footage.

94.     As Jane Doe D.D. lay on the examination table with her legs spread, she realized that Dr. Tyndall was looking at her vagina for a very long time. While staring at her vagina, the doctor said, "It's clean, very clean, you're very clean." Jane Doe D.D. felt very embarrassed and uncomfortable.

95.     Jane Doe D.D. thought that Dr. Tyndall's procedures and comments were inappropriate and intrusive. However, because there was a chaperone in the room, and Jane Doe D.D. had not been examined by a gynecologist before, she reassured herself that everything must be normal.

96.     Jane Doe D.D. left the appointment feeling very uneasy. Several days later, Dr. Tyndall left her a voicemail with the results of her examination, which she did not return.

97.     Jane Doe D.D. felt violated by Dr. Tyndall's comments and procedures.

- 17 -

98.     Jane Doe D.D. later saw a female physician for a pelvic exam and pap smear at the student health center. The doctor acted professionally, and Jane Doe D.D. felt comfortable.

99.     Jane Doe D.D. has suffered emotional distress as a result of Dr. Tyndall's treatment, and is upset that neither USC nor the chaperones stopped him.

**3.     Meggie Kwait (2008)**

100.   In 2008, Meggie Kwait was an undergraduate student at USC. She made an appointment at the student health center with Dr. Tyndall because she was concerned about some unusual bleeding.

101.   During the physical examination, Dr. Tyndall proceeded to examine her vagina.  Throughout the examination, he kept talking about very personal things.  Dr. Tyndall seemed fixated on Ms. Kwait's weight and the fact that she had engaged in sexual encounters with both men and women.

102.   Dr. Tyndall insisted on calling her "a virgin" because "let's be honest: no penis, no sex." At one point, without consulting Ms. Kwait, he made a telephone call, presumably to a colleague, to express his amazement that an insurance company "had made a virgin have a pelvic exam."

103.   While penetrating Ms. Kwait with his fingers, Dr. Tyndall said, "I bet you're pretty used to this."

104.   Dr. Tyndall urged Ms. Kwait to lose weight and told her if she became skinnier, she could probably "get a guy instead of a girlfriend."

105.   During a breast exam, he called her breasts "lovely" and "very symmetrical for their size" and handled them roughly. Throughout the appointment, Dr. Tyndall did not communicate what he was doing or why. At the conclusion of the appointment, he ridiculed Ms. Kwait for her concern over the bleeding and said that she had wasted his time.

- 18 -

106.   Dr. Tyndall's comments made Ms. Kwait extremely upset and uncomfortable. She left the appointment with Dr. Tyndall in tears and did not return to the Health Center for gynecological issues.

107.   Ms. Kwait filled out a Health Center comment card as she left the appointment. Ms. Kwait described Dr. Tyndall's comments and demeanor but never received any response from USC.

108.   When Ms. Kwait read the news about Dr. Tyndall, she felt horrible that she had not escalated her complaint.  Dr. Tyndall's conduct made her feel humiliated, demeaned, and violated, and USC's failure to protect her and other students has caused her additional distress.

**4.    Jane Doe M.M. (2008)**

109.    In or about 2008, Jane Doe M.M. was studying cinema as an undergraduate at USC. She made an appointment at the student health center with Dr. Tyndall because she suspected that she had a urinary tract infection.

110.   Before meeting with Dr. Tyndall, Jane Doe M.M. gave a urine sample to a nurse.

111.   When she arrived at her appointment, Jane Doe M.M. met with Dr. Tyndall at his desk, which was separated from the examination area by a curtain. As they talked, Dr. Tyndall showed Jane Doe M.M. a photo of his wife. Jane Doe M.M. had not asked him about his wife or asked to see a photo. When she viewed the photo, it occurred to Jane Doe M.M. that the wife looked quite a bit younger. Then Dr. Tyndall also brought up Lady Gaga, which made Jane Doe M.M. feel awkward. She suspected that Dr. Tyndall was trying to relate to her. Jane Doe M.M. felt put off that Dr. Tyndall had shared unnecessary information about his personal life.

112.   Dr. Tyndall then did an external exam with Jane Doe M.M. partially undressed. As Dr. Tyndall pressed on Jane Doe M.M.'s bare abdomen to feel for any pain, he declared that her "abs" felt very strong and asked if she was a runner.

- 19 -

113.   Jane Doe M.M. recalled other doctors asking if she was a runner, but they had always asked while checking her blood pressure or other vitals, and she had always been fully clothed. This time, the question felt different, and inappropriate.

114.   Jane Doe M.M. began to feel extremely tense and nervous. She was already very uncomfortable because Dr. Tyndall had tried to engage her in a personal conversation about his wife and Lady Gaga. Dr. Tyndall's comments about her body compounded Jane Doe M.M.'s uneasy feeling.

115.   Jane Doe M.M. left the appointment feeling distraught and uncomfortable. She made a note never to see Dr. Tyndall again.

116.   After reading the reporting about Dr. Tyndall in the Los Angeles Times, Jane Doe M.M. realized that her distress during her visit to the student health center was valid. She is upset that USC failed to provide her and other female students with safe, appropriate, and professional healthcare.

**5.     Jane Doe H.R. (2010)**

117.   Jane Doe. H.R. attended USC from 2010-2012. She was examined by Dr. Tyndall on at least one occasion in 2010.

118.   During the appointment, Jane Doe H.R. told Dr. Tyndall that she was worried because she had been experiencing heavy periods and passing large blood clots. In response, Dr. Tyndall asked Jane Doe H.R. to "bring in her blood clots" after her next cycle.

119.   When Jane Doe H.R. asked how she would do that, he told her to put them in a Ziploc bag and bring it to him during her next appointment. Instead of offering medical advice or a diagnosis, or referring her to a specialist, Dr. Tyndall made a highly inappropriate request. At the time, Jane Doe H.R. felt very confused but believed it to be a legitimate request because it was coming from a USC-employed doctor.

120.   Dr. Tyndall made other comments Jane Doe H.R. found inappropriate and unprofessional. He told her that he decided to be an OBGYN because he realized it was easier and paid more than his previous career.

121.   Jane Doe H.R. does not recall a chaperone being present for her pelvic exam.

122.   After the appointment, Jane Doe H.R. decided not to follow through with the request because she could not understand how to accomplish it and felt embarrassed by the idea of bringing her menstrual blood to campus in a Ziploc bag.

123.   Since her visit to Dr. Tyndall, Jane Doe H.R. has seen other OBGYNs who have offered sympathetic care for Jane Doe H.R.'s heavy and painful periods. On one occasion, Jane Doe H.R. relayed the encounter and Dr. Tyndall's request to another medical professional, who found it highly unusual.

124.   Since her visit to Dr. Tyndall, Jane Doe H.R. has struggled with her experiences as a patient of Dr. Tyndall, but believes that his conduct was inappropriate and humiliating. She believes Dr. Tyndall abused his power as a medical professional by making a completely inappropriate request seem legitimate.

125.   When Jane Doe H.R. heard about the accounts of other women in his care, she realized her experience was not an isolated incident but part of a pattern of inappropriate behavior with patients.

126.   Jane Doe H.R. has experienced feelings of humiliation and confusion around her appointment with Dr. Tyndall. Jane Doe H.R. believes her ability to trust doctors has been severely impacted, and that the quality of care provided to her may suffer as a result. Jane Doe H.R. characterizes herself as an exceedingly trusting person, and is crushed that her trust of people in general, and medical professionals in particular, has been compromised by the actions of Dr. Tyndall and USC.

### 6.    Jane Doe 1 (2010-2011)

127.   In or about 2010-2011, as an undergraduate studying theater at USC, Jane Doe 1 made an appointment for a pelvic exam at the student health center because she was experiencing pain in her pelvic area.

128.   Jane Doe 1 knew that Dr. Tyndall was the only gynecologist on staff at the student health center. Although she would have preferred to see a woman doctor, she trusted USC to provide her with safe, professional care. Furthermore, Jane Doe 1 had received a pelvic exam from a male gynecologist prior to her visit with Dr. Tyndall, and her experience had been comfortable and professional. She expected to have the same experience with Dr. Tyndall.

129.   Jane Doe 1 entered Dr. Tyndall's examination room, where his desk area was separated by a curtain. Dr. Tyndall asked Jane Doe 1 why she was there, and she responded that she was having pelvic pain. He asked her to go behind the curtain and get undressed.

130.   Jane Doe 1 suddenly realized that there was no female chaperone in the exam room, and she became tense. She asked for a woman to be present during her exam. Dr. Tyndall obliged and brought in a female chaperone.

131.   To begin the examination, while wearing her gown, Jane Doe 1 laid down on the table and spread her legs. Dr. Tyndall inserted his fingers into Jane Doe 1's vagina. While Dr. Tyndall's fingers were inside of her, he asked Jane Doe 1 if she knew how to orgasm.

132.   Jane Doe 1 became very uncomfortable as she wondered how the question could possibly be relevant to her pelvic exam. She continued staring at the ceiling and responded "yes."

133.   With his fingers still inside of her, Dr. Tyndall responded that he was glad Jane Doe 1 knew how to orgasm, because most women did not. He stated that most women have to be taught.

- 22 -

134.   As the examination continued, Dr. Tyndall looked into Jane Doe 1's vagina. He commented that her cervix looked bruised. Jane Doe 1 became very self-conscious because the doctor was looking into her most private areas and commenting on its appearance.

135.   After the examination was over, the female chaperone left the room. Dr. Tyndall remained. Before Jane Doe 1 had a chance to get dressed, Dr. Tyndall asked if she was having a lot of "rough sex." Jane Doe 1 was horrified. She said no. Dr. Tyndall continued. He advised her to "stop having rough sex" on account of her allegedly-bruised cervix.

136. Jane Doe 1 left the appointment feeling distressed and violated. She blamed herself into being "tricked" into seeing a male OBGYN, and she vowed never to return to Dr. Tyndall again.

137.   Jane Doe 1 experienced extreme emotional distress after the incident with Dr. Tyndall. She felt a loss of agency around men. At times, Jane Doe 1 has felt nervous, awkward, and afraid to talk to men.

138.   On multiple occasions after the incident with Dr. Tyndall, Jane Doe 1 has felt uncomfortable being sexually active, and has lacked the desire to have sex with her male partners. Rather than having sex out of her own desire, as she did before, she has often felt coerced into having sex with men. Jane Does 1's experience with Dr. Tyndall has severely impacted or destroyed the sexuality she previously felt.

139.   Jane Doe 1 went back to the OBGYN in 2013, and the experience was very different. The doctor did not ask her any unnecessarily-personal questions.

140.   Recent media reports about Dr. Tyndall have brought back the guilt, shame, and anger that Jane Doe 1 experienced at the time. She feels very embarrassed and distressed that she saw the doctor, and she blames herself for expecting that USC would protect her. People around Jane Doe 1 have made jokes about Dr. Tyndall since the media reports surfaced, making her feel like a terrible punchline that must remain

- 23 -

hidden.   Jane Doe 1 has thus been severly damaged by Dr. Tyndall's and USC's actions.

**7.     Jane Doe J.L. (2011-2013)**

141.   From 2011 to 2013, Jane Doe J.L. was completing a Masters in social work at USC. She saw Dr. Tyndall for a pap smear and pelvic exam on August 25, 2011 and for a birth control consultation on December 7, 2012.

142.   During the appointment, Dr. Tyndall asked Jane Doe J.L., a Korean-American, to meet with him in his office, which at that time was a separate room from the examination room.

143.   Dr. Tyndall discussed birth control with  Jane Doe J.L. Jane Doe J.L. mentioned that she liked the birth control she was on when she was living in Korea.

144.   Dr. Tyndall immediately told Jane Doe J.L. about his Filipino wife. He said that they had a traditional Filipino wedding, and that he has great appreciation for Asian culture. Dr. Tyndall pointed out that he was wearing a traditional Filipino shirt that day.

145.   Jane Doe J.L. began to feel very uncomfortable by the tone and the subject matter of the conversation. Dr. Tyndall was sharing overly personal information, and she became very nervous. She had a sinking feeling that Dr. Tyndall was trying to communicate to her that he was attracted to Asian women. All of a sudden, she felt it was very inappropriate to be alone with the doctor. Jane Doe J.L. felt distressed by the incident and did not return to see Dr. Tyndall.

146.   Jane Doe J.L. is now an in-patient social worker in a hospital, where she works with patients and teams of doctors every day. Given her training, Jane Doe J.L. now fully realizes the extent to which Dr. Tyndall's conversation with her was inappropriate. Since her appointment with Dr. Tyndall, Jane Doe J.L. has never witnessed a doctor speaking to a patient that way.

- 24 -

147.   Jane Doe J.L. has also been a patient to many other doctors since, and she has never experienced the level of discomfort she did with Dr. Tyndall.

148.   In her capacity as a social worker, if Jane Doe J.L. encountered a physician sharing highly personal information with a patient in the same tone as Dr. Tyndall, and with an emphasis on the patient's ethnicity, she would report the incident.

149.   The experience with Dr. Tyndall haunts Jane Doe J.L. to this day. When she recently learned that she would have to undergo fertility treatments, she was referred to a male fertility doctor and male surgeon. She wanted to see the best doctors, but her past experiences made her feel very uncomfortable. Jane Doe J.L. has required her husband to be present during visits to make her feel safe. The trauma of seeing Dr. Tyndall as a young woman has compounded stress and emotion of undergoing fertility treatments.

150.   When the media reported on Dr. Tyndall's inappropriate behavior, Jane Doe J.L. was distressed to learn that USC had known of and allowed him to continue to treat vulnerable, young female patients.

**8.    Jane Doe F.M. (2012-2013)**

151.   Jane Doe F.M attended USC from 2009-2013. During her junior or senior year, Jane Doe F.M. saw Dr. Tyndall for an appointment at the student-health center to get her birth control prescription refilled. At the time, Jane Doe F.M. had only had full gynecological exams performed a few times.

152.   When Jane Doe F.M. arrived for her appointment, Dr. Tyndall asked her why she was there. She told him she needed to get her birth control prescription refilled. Dr. Tyndall then suggested, in a strangely talkative way, that he better do a full check-up while Jane Doe F.M. was there.  Dr. Tyndall quickly left the room, told Jane Doe F.M. to take off all of her clothes, and had his nurse grab her a robe.

- 25 -

153.   Jane Doe F.M. had not intended to get an examination done, especially because she was uncomfortable with the notion of a male OBGYN examining her, but Dr. Tyndall just pushed ahead with the process. She figured Dr. Tyndall must have her best interests at heart as a doctor.

154.   Once Jane Doe F.M. was undressed and laying on the examination table, Dr. Tyndall touched her bare breasts with his hands and digitally penetrated her, all the while chatting away with a familiarity that she found odd and uncomfortable.  The female nurse was in the examination room at the time, which made Jane Doe F.M. feel like everything Dr. Tyndall was doing must be appropriate and routine.

155.   While his fingers were inside of her, Dr. Tyndall made a joke about his wife being an Asian mail order bride that contained sexual overtones.  Dr. Tyndall made a comment about how he "was used to feeling small breasts" like Jane Doe F.M.'s breasts because his wife was an Asian mail order bride.  Jane Doe F.M. was very uncomfortable by the tone and the subject matter of the conversation.

156.   Jane Doe F.M. left the examination feeling extremely uncomfortable and violated.  She has never visited a male OBGYN again, and eventually got an IUD in order to avoid going to the OBGYN altogether.

157.   When Jane Doe F.M. first heard reports that Dr. Tyndall had abused many women, she immediately replayed her experience with him. She was incredibly upset when she heard that USC knew about Dr. Tyndall's inappropriate behavior and did nothing to stop him from preying on young women in a very vulnerable time of their lives. Jane Doe F.M. is outraged that USC failed to protect young women who, like herself, had no context for what a gynecological exam should be like and were too embarrassed to speak up.

### 9.     Jane Doe 2 (2013-2014)

158.   Jane Doe 2 saw Dr. Tyndall for a gynecological exam in or about 2013 or 2014. Prior to her appointment with Dr. Tyndall, she had never been examined by an OBGYN before.

159.   Jane Doe 2 made the appointment because she had engaged in sexual intercourse for the first time and had not used protection. She felt an urgency to see a doctor, and she went into the appointment feeling very nervous and vulnerable.

160.   Jane Doe 2 first met with a nurse. She informed the nurse that she had engaged in unprotected sex and wanted to be tested for STDs.

161.   The nurse directed Jane Doe 2 to get undressed and put on a gown. After Jane Doe 2 was wearing the gown, Dr. Tyndall and a chaperone entered the examination room.

162.   As Jane Doe 2 lay on the examination table, wearing a gown and with her legs spread, she felt Dr. Tyndall insert his fingers into her vagina. He did not tell Jane Doe 2 that he was going to insert his fingers, nor did he tell her why.

163.   With his fingers inside of Jane Doe 2, Dr. Tyndall said, "ok it is tight and inflamed," in reference to Jane Doe 2's vagina. He did not tell her what to expect from a pelvic exam and pap smear, why he was inserting his fingers, or what the inflammation might mean.

164.   The comment and procedure made Jane Doe 2 feel very uncomfortable and ashamed. However, she was reassured by the presence of the female chaperone, who she assumed would have her best interest in mind.

165.   After the examination was over, Dr. Tyndall told Jane Doe 2 to get dressed and meet with him in his office, which was a separate room from the examination room. Jane Doe 2 became alarmed that the doctor wanted to meet with her one-on-one, and there was no longer a female chaperone present. She thought he might want to discuss a medical problem.

166.   But in his office, Dr. Tyndall asked Jane Doe 2 to tell him about herself: what she was studying, her race and ethnicity. Jane Doe 2 told Dr. Tyndall that she was graduating. Dr. Tyndall told Jane Doe 2 about his Filipino wife.

167.   Dr. Tyndall then turned to Jane Doe 2's recent sexual encounter. He asked Jane Doe 2 if her first time having sexual intercourse had been painful, and whether it had been with a random person or with a partner.

168.   Jane Doe 2 answered the doctor's questions because she felt that she had no choice. He was an authority figure. She told him that she took the morning after pill within the recommended time and had all her HPV vaccines, hoping the information about her precautions would put a stop to the personal questions. But it did not. Rather than give medical information about the morning-after pill, Dr. Tyndall simply remarked continuously about the high price of the pill.

169.   Dr. Tyndall then told Jane Doe 2 that he had one patient who lost her virginity and contracted genital warts as a result, her partner had not exhibited symptoms at the time, and she would have to live with genital warts for the rest of her life. He added that this patient was in a "committed relationship" and the encounter had not been "a one-night stand" like Jane Doe 2's.

170.   Jane Doe 2 became very uncomfortable, in part because she felt judged, as if Dr. Tyndall was putting words in her mouth and unnecessarily characterizing her sexual encounter. She also had not received the results of her pap smear yet, and she felt that the doctor was attempting to intimidate her.

171.   Dr. Tyndall told Jane Doe 2 that he wanted her to get an IUD, and that he would put in an order right away so that she could obtain it before her student health insurance ran out (she was graduating).

172.   Jane Doe 2 felt extremely uncomfortable with the conversation, but because she had never been to the gynecologist before, she did not know the degree to which it was abnormal and inappropriate.

- 28 -

173.   Jane Doe 2 left the appointment feeling distressed. She decided that she would never return to Dr. Tyndall.

174.   From there, Jane Doe 2 scheduled a subsequent appointment with a different OBGYN to receive birth control. Her appointment with the other OBGYN felt normal and comfortable.

175.   In hindsight, Jane Doe 2 realizes that Dr. Tyndall's behavior toward her was violative and highly inappropriate. She has suffered emotional distress since the appointment, and her distress has become heightened since learning that USC allowed Dr. Tyndall to abuse many women like herself.

**10.    Jane Doe J.C. (2011 – 2015)**

176.   Jane Doe J.C. attended USC from 2011-2015, during which she was a patient of Dr. Tyndall's for the first two years.

177.    Dr. Tyndall was the first OBGYN Jane Doe J.C. ever saw.  During the pelvic exam, Dr. Tyndall used his fingers in a pumping motion in order to "palpate" Jane Doe J.C.'s uterus and ovaries.  She did not know the normal procedures for a pelvic exam, and had no way of knowing whether Dr. Tyndall's methods were improper.

178.   Jane Doe J.C. is half Filipino.  During a couple of the appointments with Dr. Tyndall, he commented that Jane Doe J.C. was pretty. Dr. Tyndall mentioned that he completed his medical training in the Philippines, he had a Filipina wife, and all Filipina women are beautiful. Jane Doe J.C. felt uncomfortable and felt Dr. Tyndall was trying to get personal with her in an inappropriate way.

179.   Jane Doe J.C. saw Dr. Tyndall for approximately four visits before switching her care to Planned Parenthood. She made the switch because she felt extremely uncomfortable with Dr. Tyndall. As a people pleaser, Jane Doe J.C. originally felt like she was being difficult for not liking Dr. Tyndall. She told her friends how creepy Dr. Tyndall was and to avoid seeing him if they could, but did not

- 29 -

realize the extent of his behavior until learning how to perform pelvic exams herself a couple of years later. When Jane Doe J.C. first heard reports that Dr. Tyndall had abused many women, she felt validated in her experiences.

180.   As a current medical student who has learned how to perform a proper pelvic exam (as well as visits to other, more professional OBGYN doctors), Jane Doe J.C. now knows just how inappropriate Dr. Tyndall's behavior was.

181.   In her three years of medical school, she has had the privilege of witnessing doctor-patient relationships from the other side. The trust placed in the hands of a physician, especially an OBGYN, is immense. In addition to feeling physically violated, she still currently feels emotionally violated due to that breach of trust. Looking back, she is outraged and disgusted that Dr. Tyndall was in a position of power to be able to abuse so many young and vulnerable women for so long. Since her experience with Dr. Tyndall, she has only felt comfortable seeing female OBGYN's.

**11.   Jane Doe A.N. (2015)**

182.   Jane Doe A.N. was examined by Dr. Tyndall in 2015, during her senior year at USC. She had been having heavy periods and severe cramping that interfered with her daily activities, so she scheduled an appointment for an evaluation with Dr. Tyndall.

183.   At the time, Jane Doe A.N. was 21-years old, and this was her first experience with going to the OBGYN. She did not know the normal procedures for a pelvic exam, so she had no way of knowing whether Dr. Tyndall's methods were improper.

184.   When Jane Doe A.N. arrived for her appointment, she was immediately put off by Dr. Tyndall's attempt to greet her in Vietnamese and his comments about Asian women's beauty. During the appointment, Dr. Tyndall told Jane Doe A.N. that her "skin was very beautiful," and that she "could be a model." Jane Doe A.N. found these comments to be very out-of-line at the time.

- 30 -

185.   Once Jane Doe A.N. was undressed and laying with her legs spread open on the examination table, Dr. Tyndall digitally penetrated her. He commented on Jane Doe A.N.'s "wetness" and asked if she had a higher level of secretion compared with her friends.  Dr. Tyndall was not wearing any gloves at the time.  Jane Doe A.N. felt extremely uncomfortable, but because of her lack of experience, she did not know that it was abnormal for OBGYNs to do this type of examination without gloves.

186.   Without performing any medical tests, Dr. Tyndall told Jane Doe A.N. that she needed to go on birth control to treat her heavy periods and severe cramping without providing a reason why this would help Jane Doe A.N. with her symptoms.  Dr. Tyndall similarly did not provide any explanation as to the cause of these symptoms.  Jane Doe A.N. did not follow Dr. Tyndall's advice because she did not trust the conclusion of his exam or the limited treatment options he offered her.

187.   After the appointment, Jane Doe A.N. told a couple of her close friends that Dr. Tyndall was "creepy" and she was not going back to see him again even though it meant she would have to suffer through the heavy periods and severe cramping she was experiencing without further treatment.

188.   When Jane Doe A.N. was finally able to see another OBGYN approximately one year later, the OBGYN performed an ultrasound exam in her office and a pap smear.  The ultrasound revealed endometrial hyperplasia, polyps, and pathologic menstrual bleeding patterns. A blood panel, hormone panel, and endometrial biopsy were performed. Panel results were within normal limits and endometrial biopsy revealed presence of adenomas and ruled out neoplasms.

189.   When Jane Doe A.N. first heard reports that Dr. Tyndall had abused many women, she realized she had not been the victim of an isolated occurrence, but rather a victim of a series of abuses. The distress she felt at the time of her examination came flooding back. She is upset and feels betrayed that USC allowed this to happen to her and so many other women.

**12.     Jane Doe N.K. (2013-2017)**

190.    Jane Doe N.K. was an undergraduate student at USC from 2013-2017. During that time, she was a regular patient of Dr. Tyndall.

191.    Jane Doe N.K. saw Dr. Tyndall approximately ten times during her tenure at USC. She regularly went to Dr. Tyndall for pap smears to check for sexually transmitted diseases.

192.    Each time Jane Doe N.K. was examined by Dr. Tyndall, he inserted his fingers into her vagina before using the speculum. On at least one occasion, he explained that he was inserting his fingers first to minimize pain and discomfort that could be caused by the speculum.

193.    On at leaest one occasion, Dr. Tyndall commented that Jane Doe N.K.'s vagina looked "very good" and "nice."

194.    Jane Doe N.K. always felt uncomfortable on her visits with Dr. Tyndall, but she thought that it was normal to feel uncomfortable during gynecological exams.

195.    There was a chaperone in the room for some, but not all, of Jane Doe N.K.'s examinations.

196.    Jane Doe N.K. thought that Dr. Tyndall's practices and procedures were normal until she read Los Angeles Times reports that told her otherwise. She feels extremely violated and distressed, especially considering the number of visits she had with Dr. Tyndall. She feels traumatized and angry that USC failed to protect her.

**13.     Jane Doe L.Y. (2016)**

197.    In 2016, Jane Doe L.Y. was an undergradate student at USC studying psychology. She scheduled an appointment at the student health center with Dr. Tyndall because she thought she should have a pelvic exam prior to graduation. It was her first ever appointment with an OBGYN.

- 32 -

198.   Jane Doe L.Y. had made an appointment with Dr. Tyndall in August of 2015, but she cancelled it because she was uncomfortable about seeing a male OBGYN.

199.   When the 2016 appointment with Dr. Tyndall began, Jane Doe L.Y. was relieved because there was a female chaperone in the room.

200.   Because it was her first appointment with an OBGYN, Jane Doe L.Y. did not know what to expect. Dr. Tyndall told her that the exam was supposed to feel physically uncomfortable.

201.   During the exam, Dr. Tyndall used lubricant and inserted his fingers into Jane Doe L.Y.'s vagina. She did not know at the time that this was not standard practice.

202.   While his finger was inside of her, Dr. Tyndall asked Jane Doe L.Y. if she was a runner because of her "tight muscles." Although the comment made her feel nervous and violated, she had been running on the treadmill about five days a week for a month. She told herself that maybe Dr. Tyndall was just reconigizing a fact about her body.

203.   Even though she was nervous and uncomfortable, the presence of a female chaperone in the room communicated to her that everything was proper. Still, during and after the examination, Jane Doe L.Y. felt in her gut that something was wrong.

204.   After the appointment, Dr. Tyndall talked to Jane Doe L.Y. alone in his office.

205.   Jane Doe L.Y. left the appointment with Dr. Tyndall feeling very uncomfortable, and vowing never to repeat the experience. She has not received gynecology services since the incident with Dr. Tyndall, even when she felt like she should.

206.   When Jane Doe L.Y. read about Dr. Tyndall in the media, it validated her suspicion that Dr. Tyndall had acted inappropriately while examining her. Now, Jane Doe L.Y. will never see a male gynecologist again, and she has lost trust in all male physicians.

207.   Jane Doe L.Y. feels violated, and she is experiencing extreme emotionally distressed. She has scheduled counseling services to help her cope emotionally.

**14.   Jane Doe T.Y. (2016)**

208.   In 2016, Jane Doe T.Y. was a graduate student at USC. She made an appointment at the student health center with the only available physician, Dr. Tyndall, because she was having cramps related to a medical condition.  To the best of Jane Doe T.Y.'s recollection, Dr. Tyndall proceeded to have her come back for approximately five appointments over a two-month period.

209.   During the initial physical examination and with a nurse present, Dr. Tyndall told Jane Doe T.Y. he needed to check to see if the speculum would fit. He initially inserted one finger into her vagina and then inserted a second finger. Jane Doe T.Y. felt uncomfortable with the procedure, but did not know if this was normal.

210.   While he was digitally penetrating her, Dr. Tyndall commented on how her pelvic muscles were so strong and she must be runner. Dr. Tyndall's personal comments about her body while penetrating her with his fingers made her uncomfortable and distressed.

211.   Dr. Tyndall had Jane Doe T.Y. make return appointments several times over two months. Her friends asked why she had to go back to the doctor so often, and while Jane Doe T.Y. found Dr. Tyndall creepy, she was worried about her health and understood that he was the only doctor available to her.

212.   During at least one of the appointments, she met with Dr. Tyndall in his office to discuss birth control at his urging. She was not interested in birth control, but

- 34 -

Dr. Tyndall insisted that she should not ruin her body by getting pregnant because "babies are disgusting." She inquired why he was an OBGYN if he felt that way, and he said he would prefer to work with students.

213. During the appointments, Dr. Tyndall would ask invasive questions about Jane Doe T.Y.'s sexual experiences and, one time, commented that she "must love living on the edge."

214. During several appointments, Dr. Tyndall went on several rants regarding how he felt that the United States needed stronger immigration policies to get rid of the Latino immigrants. Dr. Tyndall's rants led Jane Doe T.Y. to tell a friend that she thought Dr. Tyndall was a racist.

215. On one occasion, Dr. Tyndall conducted a full body mole scan, claiming to be looking for moles, and told her she had "flawless skin like all Asians." Jane Doe T.Y. found Dr. Tyndall's comments creepy.

216. During this same appointment, Dr. Tyndall also conducted a breast examination, while making inappropriate comments, such as how perfect her body was, that made her extremely uncomfortable.

217. Each appointment over the course of that two months took approximately 30-40 minutes, which seemed increasingly unnecessary and unrelated to the purpose of her original visit. However, she was too naïve to believe that the doctor would not be asking her to return if she did not need medical care.

218. When Jane Doe T.Y. saw the articles about Dr. Tyndall and learned that his inappropriate conduct had been going on for 30 years, she felt traumatized and upset that USC had failed to protect her.

**15.    Jane Doe A.H. (2016)**

219. Jane Doe. A.H. is a graduate student at USC. She was examined by Dr. Tyndall on March 3, 2016. In order for her Aetna Student Health insurance to cover the appointment, Jane Doe A.H. was required to go to USC's student health center.

- 35 -

The other OBGYNs were booked for months, so the only way Jane Doe A.H. could get an appointment quickly was to see Dr. Tyndall.

220.   At her appointment with Dr. Tyndall, a nurse or chaperone was present in the room for her examination.

221.   During the pelvic exam, Dr. Tyndall used his fingers to penetrate Jane Doe A.H.  He also commented that she had "strong pelvic muscles" and asked if Jane Doe A.H. was a runner.  Jane Doe A.H. found Dr. Tyndall's comment to be extremely inappropriate and disturbing but questioned her discomfort given that a nurse was present.

222.   Dr. Tyndall also examined Jane Doe A.H.'s back and asked about her nationality.  When Jane Doe A.H. responded that she was American, Dr. Tyndall asked where her parents were from.  Jane Doe A.H. explained that her parents were Israeli, and Dr. Tyndall commented, "Oh that explains the (back) hair.  Middle Eastern women have more (back) hair."  Jane Doe A.H. found these comments to be extremely disturbing.

223.   Distressed by what had occurred, Jane Doe A.H. texted some of her friends and told them what happened.  They were also disturbed by Dr. Tyndall's comments and behavior.

224.   Since that time and as a result of the distress, Jane Doe A.H. has only agreed to see the female gynecologists at USC to avoid another uncomfortable, distressing encounter. She also became very self-conscious about her back hair.

225.   Jane Doe A.H. was very upset when she heard that complaints had been lodged against Dr. Tyndall for years and he was still allowed to practice at the USC health center. She is extremely upset that USC put her in a position where her only option for timely gynecological treatment was to see a perpetrator who should have been dismissed decades ago. Jane Doe A.H. was also upset that she had not lodged a complaint earlier. Before the news broke, Jane Doe A.H. felt that Dr. Tyndall's

- 36 -

comments were inappropriate but did not realize that the pelvic exam and body scan he conducted were unnecessary. At the time, Jane Doe A.H. trusted Dr. Tyndall, the chaperone, and the USC health center to only perform necessary and appropriate examinations.

226.   Jane Doe A.H. feels even more violated now knowing that Dr. Tyndall touched and examined her body in inappropriate ways that did not serve any medical purpose.  Jane Doe A.H. is a graduate student who studies gender and a large part of her identity is feeling that she is informed, independent, and in control of her body. She is distressed that USC contributed to the cycle of training women to accept abusive behavior, especially from men in positions of power and trust.  This has rattled Jane Doe A.H.'s identity and affected her sense of control over her life and her body.

**F.    The statute of limitations is tolled based on the continuing violations doctrine and fraudulent concealment.**

227.   Tyndall concealed the existence of Plaintiffs' claims and that Plaintiffs had a cause of action against Tyndall and/or USC at the time his sexual assaults occurred making a material representation(s) to Plaintiffs involving a past or existing fact by:

a.    Misrepresenting that his acts and/or conduct were for the purpose of conducting a vaginal examination;

b.    Misrepresenting that digital penetration of a woman's vagina at the outset of a gynecological examination was medically appropriate, contemporaneously and/or shortly before the abrupt, sudden, quick and unexpected sexual assaults by Tyndall;

c.    Misrepresenting that his acts and/or conduct were for the purpose of conducting a breast examination;

d.    Misrepresenting that it was necessary for a female patient to be fully naked for a gynecologist to conduct a full body scan for skin irregularities;

e.    Misrepresenting that his acts and/or conduct was "treatment" and/or conformed to accepted medical practice.

228.   The material representation(s) to Plaintiffs and the Class were false, in that Tyndall was actually performing these examinations for his own sexual gratification and pleasure.

229.   When Tyndall made the material representation(s), he knew that they were false, in that he knew that the examinations were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or gynecology.

230.   Tyndall made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiffs and the Class, in that Plaintiffs and the Class Members should believe that the examinations were proper, appropriate, and legitimate; should not believe that they had been sexually assaulted; should not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults; should continue to be seen by him so that he could continue to sexually assault them; should not question and/or report the conduct to appropriate authorities; and should not reasonably believe and not be aware of a possible cause of action that they have against Tyndall and/or USC.

231.   Plaintiffs and Class Members acted in reliance upon the material representation(s), in that they:

a.    reasonably believed that the examinations were proper, appropriate, and legitimate;

b.    reasonably did not believe that they had been sexually assaulted;

c.    did not believe that they should question and/or report the conduct to appropriate authorities; and,

d.    did not reasonably believe that they had and were not aware of a possible cause of action that they had against Tyndall and/or USC.

- 38 -

232.   Plaintiffs and Class Members suffered injury, in that they could not stop the sexual assault and suffered discomfort, severe emotional distress, shock, humiliation, fright, grief, embarrassment, and disgrace.

233.   Tyndall further concealed the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

a.   Misrepresented to other medical professionals in the examination room that digitally penetrating female patients was medically necessary and appropriate;

b.   Prevented other medical professionals, chaperones, and/or caregivers from being in the room during examinations and treatments of Plaintiffs and Class Members so that he could sexually assault them; and

c.   Did not abide by or follow the standard and care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients.

234.   Directors, managers, supervisors, physicians, nurses, chaperones in USC's student-health center took affirmative steps to fraudulently conceal Tyndall's misconduct, including, but limited to, by depressing complaints made by patients by imposing onerous reporting requirements on them.

235.   Directors, managers, supervisors, physicians, nurses, chaperones in USC's student-health center also misrepresented that Tyndall's conduct during examinations was proper, including, but not limited by (i) watching Tyndall's conduct as a purported chaperone without stopping the improper conduct; (ii) permitting Tyndall to conduct examinations without a chaperone present; and (iii) scheduling female patients for appointments with Tyndall despite having full knowledge of his improper conduct.

236.   The actions and inactions of Tyndall and USC constituted fraudulent concealment.

- 39 -

237.    At all times pertinent to this action, Tyndall was an agent, apparent agent, servant, and employee of USC and operated within the scope of his employment and his negligence is imputed to USC.

238.    Plaintiffs and Class Members did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against Tyndall and/or USC until the May 15, 2018 publication of a story by the Los Angeles Times.

## V.     CLASS ALLEGATIONS

239.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class:

> All women who were examined by George Tyndall, M.D. at
> the University of Southern California.

240.    The Class consists of hundreds, if not thousands, of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by USC.

241.    The claims of Plaintiffs are typical of the Class. The claims of the Plaintiffs and the Class are based on the same legal theories and arise from the same unlawful pattern and practice of sexual harassment and assault.

242.    There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect only individual Class Members within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

243.    Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

> a.      Whether Tyndall engaged in a sexual harassment,
>         assault, and battery;

- 40 -

b.    Whether Tyndall's sexual harassment, assault, and battery was committed within the scope of his employment at USC;

c.    Whether the USC Defendants had knowledge of Tyndall's sexual harassment, assault, and battery;

d.    Whether the USC Defendants facilitated Tyndall's pattern and practice of sexual harassment, assault, and battery;

e.    Whether the USC Defendants or Tyndall engaged in conduct designed to suppress complaints or reports regarding Tyndall's conduct;

f.    Whether the USC Defendants negligently retained or supervised Tyndall;

g.    Whether the USC Defendants ratified Tyndall's conduct; and

h.    Whether the USC Defendants are responsible for Tyndall's conduct under the doctrine of respondeat superior.

244.    Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to USC's legal responsibility for Tyndall's actions, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

245.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other respective Class Members, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Class.

- 41 -

# VI.    CAUSES OF ACTION

## COUNT I

### VIOLATONS OF TITLE IX, 20 U.S.C. § 1681(a), *et seq.*
### (AGAINST USC AND USC TRUSTEES)

246.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

247.    Title IX of the Education Amendments Act of 1972 states, "No person in the United States shall on the basis of sex, be … subject to discrimination under any education program or activity receiving Federal financial assistance …" 20 U.S.C. § 1681, *et seq.*

248.    Plaintiffs and members of the Class are "persons" under Title IX.

249.    USC receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. §1681(a), *et seq.*

250.    USC is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

251.    Tyndall's conduct described above constitutes sexual harassment, abuse, and assault, and constitutes sex discrimination under Title IX.

252.    The USC Defendants were on notice of Tyndall's conduct as described above. The USC Defendants nonetheless failed to carry out their duties to investigate and take corrective action under Title IX.

253.    As a direct and proximate result of the USC Defendants' actions and/or inactions, Plaintiffs and members of the Class were damaged.

## COUNT II

### VIOLATION OF THE CALIFORNIA EQUITY IN HIGHER EDUCATION ACT [CAL. ED. CODE § 66270] (AGAINST THE USC, USC TRUSTEES, AND TYNDALL)

254.    Plaintiffs realleges and incorporates by reference the allegations contained in the previous paragraphs.

- 42 -

003211-11 1036534 V1

255.   Section 66281.5 of the California Sex Equity in Education Act provides in pertinent part: "(a) It is the policy of the State of California, pursuant to Section 66251, that all persons, regardless of their sex, should enjoy freedom from discrimination of any kind in the postsecondary educational institution of the state. The purpose of this section is to provide notification of the prohibition against sexual harassment as a form of sexual discrimination and to provide notification of available remedies."

256.   The USC Defendants' conduct as alleged herein constitutes sexual harassment as a form of sexual discrimination against Plaintiffs and the members of the Class, and violated the Equity in Higher Education Act. Plaintiffs are entitled to enforce the Act through a civil action pursuant to Education Code Section 66292.4.

257.   As a result of Defendants' conduct, Plaintiffs and the members of the Class have been damaged in an amount to be proven at trial.

## COUNT III

### GENDER VIOLENCE [CAL. CIV. CODE § 52.4]
### (AGAINST TYNDALL AND USC)

258.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

259.   California Civil Code § 52.4 provides that gender violence is a form of sex discrimination and includes "[a] physical intrusion or physical invasion of a sexual nature under coercive conditions…." *Id.* at §52.4(c)(2).

260.   California Civil Code § 52.4 incorporates the definition of "gender" from California Civil Code § 51, which provides: "'Gender means sex, and includes a person's gender identity and gender expression.'"

261.   Here, Plaintiffs and the Class Members are female.

262.   Tyndall physically intruded and/or invaded the bodies of Plaintiffs and Class Members during medical examinations in a sexual manner.  The conditions were

- 43 -

coercive in that Plaintiffs and Class Members were required to place their trust in their physician because he was held out to be an expert in gynecology by USC.

263.   USC participated in the physical intrusion and/or invasion of the bodies of Plaintiffs and Class Members during medical examinations by either being physically present in the room through agent chaperones or other clinic staff members and/or bringing Plaintiffs and the Class Members into the examination rooms and providing instructions to remove their clothing knowing that Tyndall would assault them in a sexual manner.

264.   Plaintiffs were injured as a result of the gender violence, and seek all remedies provided for in Civil Code Section 52.4(a), including, but not limited to, actual damages, compensatory, damages, punitive damages, costs, and attorneys' fees.

**COUNT IV**

**GROSS NEGLIGENCE**
**(AGAINST THE USC, USC TRUSTEES, AND TYNDALL)**

265.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

266.   The USC Defendants owed Plaintiffs and Class Members a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including Tyndall.

267.   Tyndall owed Plaintiffs a duty of due care in carrying out medical treatment as an employee, agent, and/or representative of the USC Defendants.

268.   By seeking medical treatment from Tyndall in the course of his employment, agency, and/or representation of the USC Defendants, a special, confidential, and fiduciary relationship between Plaintiffs and Tyndall was created, resulting in Tyndall owing Plaintiffs a duty to use due care.

269.   The USC Defendants' failure to adequately supervise Tyndall, especially after USC knew or should have known of complaints regarding his nonconsensual

- 44 -

sexual touching and assaults during medical examinations was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

270.   Tyndall's conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of the USC Defendants and under the guise of rendering "medical treatment" was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

271.   The USC Defendants' conduct demonstrated a willful disregard for precautions to ensure Plaintiffs' safety.

272.   The USC Defendants' conduct as described above, demonstrated a willful disregard for substantial risks to Plaintiffs and Class Members.

273.   The USC Defendants breached duties owed to Plaintiffs and Class Members and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiffs and Class Members' health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

274.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs and Class Members were damaged.

## COUNT V

### NEGLIGENT SUPERVISION AND RETENTION
#### (AGAINST USC AND USC TRUSTEES)

275.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

276.   At all times material since 1989 and until Tyndall was removed in 2016, the USC Defendants employed Tyndall.

277.   Tyndall was unfit or incompetent to work directly with female patients and posed a particular risk of sexually harassing, violating, and assaulting them.

- 45 -

278.   The USC Defendants knew or should have known that Tyndall was unfit or incompetent to work directly with female patients and posed a particular risk of sexually harassing, violating, and assaulting them, and that this unfitness created a particular risk to Plaintiffs and the Class.

279.   Tyndall's unfitness and particular risk to female patients harmed Plaintiffs and the Class.

280.   The USC Defendants negligence in supervising and or retaining Tyndall was a substantial factor in causing harm to Plaintiffs and the Class.

## COUNT VI

### CIVIL BATTERY
### (AGAINST TYNDALL AND USC)

281.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

282.   Tyndall intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiffs and Class Members. He did so by, *inter alia*:

  a.   Isolating Plaintiffs and Class Members in closed quarters and dismissing any bystanders; and

  b.   Causing sexual contact.

283.   Tyndall did commit an unwanted contact with Plaintiffs and the Class Members' person or property in a harmful or offensive manner, including, but not limited to, by causing molestation or sexual contact between Tyndall and each woman.

284.   Tyndall's battery of Plaintiffs and the Class caused harm, including physical, mental, and/or emotional harm of each Class Member.

285.   Tyndall's conduct was committed within the scope of his employment at USC. A causal nexus existed between Tyndall's medical examinations, USC's pattern of allowing Tyndall to examine female patients without a chaperone, and the use of his role to batter the women.  Each act of battery of a Class Member was foreseeable

given, *inter alia*, USC's knowledge that Tyndall failed to follow protocol, including but not limited with respect to the use of chaperones and taking of photographs of genitalia, complaints from patients and staff members, and the commission of the acts at USC's student-health center.

286.   Tyndall's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of USC's business. Assaults in the context of a medical examination, when women are the most vulnerable but who put themselves in that situation in order to get the medical care they need, are exactly why female patients would expect physician offices and student-health centers to take extra precautions to ensure that they are protected from the dominance of a physician in the doctor-patient relationship.

287.   Holding USC liable forwards the underlying policy goals of respondent superior, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiffs and the Class Members do not have separate remedies under Title VII because they were not employees of USC.

## COUNT VII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST TYNDALL AND USC)

288.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

289.   Tyndall's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiffs and the Class Members.

290.   Tyndall's outrageous conduct was not the type of ordinary physician examination or even rude or obnoxious behavior that women should be expected to tolerate. Rather, Tyndall's conduct exceeded all possible bounds of decency.

291.   Tyndall acted with intent or recklessness, knowing that his female victims were likely to endure emotional distress given the relationship and trust placed in physicians by patients.  In fact, he used this trust to subdue the women and prevent

- 47 -

them from complaining or suing based on his actions.  He did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

292.   Tyndall's conduct caused suffering for Plaintiffs and the Class Members at levels that no reasonable person should have to endure.

293.   Tyndall's conduct was committed within the scope of his employment at USC. A causal nexus existed between Tyndall's medical examinations, USC's pattern of allowing Tyndall to examine female patients without a chaperone, and the use of his role to intentionally inflict emotional distress on the women.  Each act of battery or assault of a Class Member was foreseeable given, *inter alia*, USC's knowledge that Tyndall failed to follow protocol, including, but not limited with respect to the use of chaperones and taking of photographs of genitalia, complaints from patients and staff members, and the commission of the acts at USC's student-health center.

294.   Tyndall's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of USC's business. Assaults in the context of a medical examination, when women are the most vulnerable but who put themselves in that situation in order to get the medical care they need, are exactly why female patients would expect physician offices and student-health centers to take extra precautions to ensure that they are protected from the dominance of a physician in the doctor-patient relationship.

295.   Holding USC liable forwards the underlying policy goals of respondent superior, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiffs and the Class Members do not have separate remedies under Title VII because they were not employees of USC.

## COUNT VIII

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST TYNDALL AND USC)

296.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

- 48 -

297.   Tyndall's conduct negligently caused emotional distress to Plaintiffs and the Class Members.

298.   Tyndall could reasonably foresee that his action would have caused emotional distress to Plaintiffs and the Class Members.

299.   Plaintiffs and the Class Members were in a specific zone of danger meeting with Tyndall in the examination room and at risk of physical harm, causing their fear when the examination became sexual in nature.

300.   Plaintiffs and the Class Members, during their medical examination, suffered distress and emotional harm.

301.   Tyndall's conduct was committed within the scope of his employment at USC. A causal nexus existed between Tyndall's medical examinations, USC's pattern of allowing Tyndall to examine female patients without a chaperone, and the use of his role to negligently inflict emotional distress on the women.  Each act of battery or assault of a Class Member was foreseeable given, *inter alia*, USC's knowledge that Tyndall failed to follow protocol, including but not limited with respect to the use of chaperones and taking of photographs of genitalia, complaints from patients and staff members, and the commission of the acts at USC's student-health center.

302.   Tyndall's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of USC's business. Assaults in the context of a medical examination, when women are the most vulnerable but who put themselves in that situation in order to get the medical care they need, are exactly why female patients would expect physician offices and student-health centers to take extra precautions to ensure that they are protected from the dominance of a physician in the doctor-patient relationship.

303.   Holding USC liable forwards the underlying policy goals of respondent superior, including the prevention of future injuries and assurance of compensation to

- 49 -

victims, given that Plaintiffs and the Class Members do not have separate remedies under Title VII because they were not employees of USC.

## COUNT IX

### RATIFICATION
### (AGAINST USC AND USC TRUSTEES)

304.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

305.    Tyndall was an agent and employee of USC between 1989 and 2016.

306.    Tyndall was acting at all times in his position as an agent of and on behalf of USC.

307.    All acts or omissions alleged were ratified by USC and USC Trustees. As alleged *supra*, many of USC's employees, managers, and supervisors, including other medical personnel in the student-health center, knew Tyndall was sexually abusing female students and refused to take any action to stop him. Moreover, USC's managers, supervisors, executives, and directors hid this information so Tyndall could continue to work for USC.

308.    With knowledge of Tyndall's sexual misconduct, no disciplinary action was taken and he was allowed to be alone with female students who attended USC.

309.    USC is thus responsible for Tyndall's acts of assault, battery, and intentional or negligent infliction of emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class Members pray that this Court:

A.    Certify the Class, name Plaintiffs as representatives of the Class, and appoint their lawyers as Class Counsel;

B.    Enter judgment against George Tyndall in favor of Plaintiffs and the Class;

- 50 -

003211-11 1036534 V1

1    C.    Enter judgment against University of Southern California in favor of

2    Plaintiffs and the Class;

3    D.    Enter judgment against the Board of Trustees of the University of

4    Southern California in favor of Plaintiffs and the Class,

5    E.    Award Plaintiffs and the Class Members damages for pain and suffering,

6    and compensatory and punitive damages,

7    F.    Award Plaintiffs their attorneys' fees and costs.

8

9

10   Dated:  June 4, 2018                    Respectfully submitted,

11                                           HAGENS BERMAN SOBOL SHAPIRO LLP

12                                           By:    /s/ Christopher R. Pitoun

13                                                  Christopher R. Pitoun
                                             301 N. Lake Ave., Suite 920
14                                           Pasadena, CA 91101
                                             Tel.: 213-330-7150
15                                           Fax: 213-330-7152
                                             Email: christopherp@hbsslaw.com
16

17                                           Steve W. Berman (*pro hac vice* pending)
18                                           HAGENS BERMAN SOBOL
19                                           SHAPIRO LLP
                                             1918 Eighth Avenue, Suite 3300
20                                           Seattle, WA 98101
                                             Tel.: 206.623.7292
21                                           Fax: 206.623.0594
                                             Email: steve@hbsslaw.com
22

23

24                                           Elizabeth A. Fegan (*pro hac vice* pending)
                                             Emily Brown (*pro hac vice* pending)
25                                           HAGENS BERMAN SOBOL
                                             SHAPIRO LLP
26                                           455 N. Cityfront Plaza Dr., Suite 2410
27                                           Chicago, IL 60611
                                             Telephone: (708) 628-4949
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Facsimile: (708) 628-4950
Email: beth@hbsslaw.com
emilyb@hbsslaw.com

003211-11 1036534 V1